FILED

2007 Nov-07  PM 02:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.                                                    CV 04-PT-199-S

CHARLES BERRY ROBISON, et al

     Defendants.

### MEMORANDUM OPINION

I write this opinion to explain why I will direct the Clerk to reassign this case to another judge for trial.[1]  At least one of the reasons is that I am so perplexed by the way the law applicable to this case has developed that it would be inappropriate for me to try it again.

The United States Court of Appeals for the Eleventh Circuit (Eleventh Circuit) in its opinion reversing the convictions in this case stated, "The parties' disagreement as to what constitutes a 'navigable water' under the [Clean Water Act] is at the heart of this appeal." *U.S. v. Robison*, 2007 WL 3087419, *5 (11th Cir. Oct. 24, 2007).[2]  I will initially try to pique the interest of the readers of this opinion by stating that the answer to that question has been determined to be what one Justice of the Supreme Court of the United States (Supreme Court)

_____

[1] Confessedly, since I have cut back on trials in Birmingham, I may have had it reassigned in any event.

[2] In a fashion, I requested the reversal.  I was apprehensive that my sentencing of the individual defendants to terms of probation might be reversed.  At sentencing I stated that I had rather see reversals of their convictions than their sentences.  My sentences were partially based on the fact that the two defendants could not have worked at the plant as it was then constructed without being involved in the discharges.  At trial the government took a similar position.  In effect, every production worker would have been involved.  Neither of these defendants was a stockholder.

has written which was not agreed to by any of the other eight Supreme Court Justices in *Rapanos v. U. S.*, 126 S. Ct. 2208 (2005).[3]  Remarkably, this conclusion was reached because the Eleventh Circuit held that a test which serves to broaden federal jurisdiction ("i.e., less restrictive of CWA jurisdiction")  is the "less far reaching" and "narrowest" of two purported tests.  This holding appears to be directly contrary to Supreme Court cases which were precedent for the Supreme Court *Marks* case relied upon by the Eleventh Circuit.  See *Furman*, *Gregg* and *Memoirs* discussions infra.

At the time I tried this case, the Eleventh Circuit had interpreted the Clean Water Act (CWA) to provide that:

(1) "Congress intended to regulate the discharge of pollutants into all waters that may eventually lead to waters affecting interstate commerce; and [(2)] that courts repeatedly had recognized that tributaries to waters affecting interstate commerce-even when man-made or intermittently flowing-were subject to the CWA."  *Robison*, 2007 WL 3087419 at *5 (citing *U.S. v. Eidson*, 108 F.3d 1336, 1341-42 (11th Cir. 1997) (internal quotation marks omitted).[4]

*The Rapanos "Decision"*

---

[3]This Supreme Court case is to be distinguished from the myriad of cases which have been decided by five-four decisions wherein the "swinging" Justice at least agreed with one of the usual four Justice groups.  For example, see *Jackson v. Birmingham Bd. of Edu..*, 549 U.S. 167 (2005) where, in a somewhat contrived opinion, the "swinging" Justice wrote an opinion, fully agreed to by a usual group of four, which held that "retaliation," previously considered a separate term of art, was really just "discrimination," previously a term of art.  At least in that case, and many similar others, there was a five Justice agreement, not a one Justice decision.  By way of disclosure, *Jackson* was another of my cases which was affirmed by the Eleventh Circuit.  While I have not researched this issue, I recall reading that in the 2006-2007 term of the Supreme Court, Justice Kennedy's vote was decisive in 16 of 19 five-four decisions.

[4]McWane, the employer defendant, sought and received a permit from ADEM and later applied for a renewal of that permit.  McWane apparently felt that such a permit was needed.  There is no question that the permit was violated.  The State program had been approved by EPA.  The permit was known as a National Pollutant Discharge Elimination Systems (NPDES) permit issued pursuant to Title 33 U.S.C. § 1342.  Compare the title of § 1342.

Slightly over a year after the jury verdicts in this case were returned, the Supreme Court

"decided" *Rapanos*.[5]  To summarize the "holding" in *Rapanos*, I quote from *U.S. v. Johnson*, 467

F.3d 56 (1st Cir. 2006):

> The decision in *Rapanos v. United States*, 126 S. Ct. 2208 (2006), resolved two consolidated cases from the Sixth Circuit . . . .[6]
>
> In both cases, the district court found that there was federal regulatory jurisdiction over the sites in question, and the Sixth Circuit affirmed.  The Supreme Court then consolidated the cases and granted certiorari to decide whether these *wetlands* constitute "waters of the United States" under the CWA, and, if so, whether the CWA is constitutional.  *See id.* at 2220.
>
> The Court issued a split decision construing the phrase "waters of the United States" as used in the CWA.  The plurality concluded that the phrase "waters of the United States" includes only "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] oceans, rivers, [and] lakes.'" *Id.* at 2225. Thus, for purposes of determining federal regulatory jurisdiction, "*only* those *wetlands* with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." *Id.* at 2226. The plurality vacated the decision of the Sixth Circuit in both cases and, noting "*the paucity of the record*," remanded for further proceedings.  *Id.* at 2235.
>
> Justice Kennedy concurred in the judgment, but rejected the plurality's rationale.  Instead, he concluded that jurisdiction extends to *wetlands* that "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 2236.  Justice Kennedy further found that *wetlands* "possess the requisite nexus" if "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other

---

[5]I will not compare the "decision" to making sausage because it would excessively demean sausage makers.

[6]"Resolved" is an overstatement.

> covered waters more readily understood as 'navigable.'" *Id.* at
> 2248.  Where the *wetlands* in question are "*adjacent to navigable-in-fact waters, [the government] may rely on adjacency to establish its jurisdiction."  Id.* at 2249.  *Where the wetlands are adjacent to nonnavigable tributaries, "[a]bsent more specific regulations . . . [the government] must establish a significant nexus on a case-by-case basis."  Id.* at 2249.
>
> Justice Stevens authored a dissent joined by three other Justices.  In the view of the dissenters, to the extent that the CWA includes a "significant nexus" requirement, this requirement "is categorically satisfied as to *wetlands* adjacent to navigable waters or their tributaries."  *Id.* at 2263-64.  The dissent concluded by noting specifically that "all four Justices who have joined this opinion would uphold the Corps' jurisdiction ... in all other cases in which either the plurality's or Justice Kennedy's test is satisfied."  *Id.* at 2265.

*Id.* at 59 (Emphasis added).

Since the Eleventh Circuit held in *Robison*, 2007 WL 3087419 at *12, that "pursuant to *Marks*, we adopt Justice Kennedy's 'significant nexus' test as the governing definition of 'navigable waters' under *Rapanos*," it is appropriate to see what the plurality said about Justice Kennedy's opinion:

1. Justice Kennedy "tests the limits of understatement."  *Rapanos*, 126 S. Ct. at 2224.

2. Language in a parenthetical of Justice Kennedy is "wrenched out of context."  *Id.* at 2232.

3. Justice Kennedy has left "the Act's 'text' and 'structure' virtually unaddressed."  *Id.* at 2233.

4. Justice Kennedy "misreads"  a previous opinion in a "turtles all the way down" position.[7]  *Id.*

---

[7]See the plurality's note 14 for an interesting discussion of this term.

5.  In an interesting indication of what "is" is, Justice Kennedy is criticized for suggesting that whatever "*affects* waters of the United States *is* waters of the United States."  *Id.* at 2234 (Emphasis in original).

6.  Justice Kennedy could arrive at his conclusion "[o]nly by ignoring the text of the statute . . . ."  *Id.*

7.  Justice Kennedy's tactic freed him to "write a different statute . . . ."  *Id.*

8.  Justice Kennedy rewrites the statute by using the "gimmick" of "significant nexus."  *Id.*

9.  Justice Kennedy's "flouting" of the statutory command is more "moderate" than that of the dissent.  "In another respect, however, it is more extreme."  *Id.* at 2234-35.

10. Justice Kennedy's standard is "perfectly opaque."  *Id.* at 2235.

11. Justice Kennedy "tips a wink" at the Corps of Engineers "inviting it to try the same expansive reading again."[8]  *Id*.

12. Justice Kennedy "has devised his new statute all on his own."  *Id.*

Justice Kennedy is not the only one to take hits from the plurality.  The plurality opinion states the following regarding the dissent:

1.  A position of the dissent "is wholly implausible."  *Id.* at 2229.

2.  A position of the dissent is "mere legerdemain."  *Id.*

3.  A position of the dissent "is the ultimate distinction without a difference."  *Id.* at 2230.

4.  The dissent's term "adjacent" may be interpreted "who knows how broadly."  *Id.*

---

[8]Amazingly, this statement was used by a later herein cited *Gerke* case to, at least partially, justify its holding.

5.  The dissent makes a "curious appeal to entrenched Executive error . . . [which] deservedly has no precedent in our jurisprudence." *Id.* at 2232.

6.  The dissent has "two defects in a single sentence" regarding its interpretation of "waters of the United States" and "the purpose of the Act[.]" *Id.*

7.  The dissent uses the "last resort of extravagant interpretation." *Id.*

8.  The dissent appeals to environmental benefits in a "patently unreasonable interpretation."[9] *Id.* at 2233.

Justice Kennedy has his own volleys:

1.  The plurality's limitations on the Act "are without support" in the language or purposes of the Act or in our cases interpreting it. *Id.* at 2242.

2.  The plurality's first requirement "makes little practical sense . . . ." *Id.*

3.  The plurality's reliance on a prior case is "misplaced." *Id.* at 2243.

4.  The plurality's conclusion that navigable waters may not be intermittent is "unsound." *Id.*

5.  The plurality's position is "unpersuasive" and based on a "wrong" premise. *Id.* at 2244.

6.  "[T]he plurality's opinion is inconsistent with the Act's text, structure and purpose." *Id.* at 2246.

7.  The plurality opinion is "unduly dismissive of the interests asserted by the United States in these cases." *Id.*

8.  The plurality has read "nonexistent requirements into the Act in an unprecedented

---

[9]See the dissent's response to this environmental charge *infra*.

reading of the Act," and the dissent has read a "central requirement out." *Id*. at 2247.

Here comes Justice Stevens:

1.  The criticisms of the plurality and Justice Kennedy are "creative." *Id.* at 2252.

2.  The plurality's reading is "revisionist." *Id.* at 2255.

3.  The plurality disregarded a prior Supreme Court opinion. *Id.* at 2265.

4.  The plurality has an "exaggerated concern about costs." *Id.* at 2258.

5.  "Rather than defending its own *antagonism to environmentalism*, the plurality counters by claiming that my dissent is 'policy-laden.'" *Id.* at 2259 (Emphasis added).

6.  The plurality's dramatic departure from an earlier ruling in its "creative opinion" is "utterly unpersuasive." *Id.*

7.  The dissent agrees with Justice Kennedy that the plurality's limitations on the Act are without support in the Act. *Id.* at 2266.

8.  The plurality has cited the dictionary "for a proposition that it does not contain." *Id.* at 2260.

9.  The plurality has "left litigants without guidance as to where the line it draws between 'relatively permanent' and 'intermittent' lies." *Id.*  AMEN!

10. "The plurality attempts to bolster its arbitrary jurisdictional line by citing two tangential statutory provisions and two inapplicable cannons of construction." *Id.*

11. "The plurality's reasoning to the contrary is 'mystifying.'" *Id.* at 2261.

12. The "plurality disregards the fundamental significance of the Clean Water Act." *Id.* at 2262.

13. The plurality's "second statutory invention is as arbitrary as its first." *Id.*

14. The plurality "plainly neglected to consult a dictionary" in defining "adjacent to." *Id.* at 2263.

The foregoing observations speak for themselves.  I will make some more comments about *Rapanos*.

1.  Nobody has attempted in any opinion to distinguish the meanings of "relatively permanent" and "intermittent."  They would seem to, "relatively," have the same meaning.  We do apparently know that waters can be relatively permanent and not intermittent if the streams, etc. dry up during a drought or are seasonal.  The plurality suggests that common sense so dictates.  *See Id.* at 2221, n. 5.  Notes 6 and 7 suggest that if a body of water is called a stream, it is not intermittent.  *See Id.* at 2221-23.  The plurality states that, "in sum, on its only plausible interpretation, the phrase 'the waters of the United States' includes . . . bodies of water that are described in ordinary parlance as' streams[.]"[10]  *Id.* at 2225.

2.  Chief Justice Roberts hit the nail on the head when he said:

a.  "It is unfortunate that *no* opinion commands a majority of the court on precisely how to read Congress' limits on the reach of the Clean Water Act."  *Id*. at 2236 (Emphasis added).

b.  "Lower courts and regulated entities will now have to feel their way on a case by case basis" when this could have been avoided.  *Id.*

3.  The test suggested by Justice Kennedy and adopted by the Eleventh Circuit was not chosen by the four justice plurality nor by the dissent.  Justice Kennedy noted that, "neither the

---

[10]Avondale Creek and Valley Creek are called creeks in ordinary parlance.  The evidence was that they continuously run.

plurality nor the dissent addresses the nexus requirement[.]"  *Id.* at 2241.

4.  Justice Kennedy stated: "[i]t follows that the Corps can reasonably interpret the Act to cover the paths of such impermanent streams."  *Id.* at 2243.  This is what the *Eidson* case, which this court followed, had held.[11]

5.  Justice Stevens says, "[u]nsurprisingly, most Courts of Appeals to consider the scope of the Corps' jurisdiction after SWANCC have unhesitatingly concluded that this jurisdiction covers intermittent tributaries . . . ."  *Id.* at 2257.

6.  Justice Stevens stated:

> Given that all four Justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases–and in all other cases in which *either* the  plurality's or Justice Kennedy's test is satisfied–on remand each of the judgments should be reinstated if *either* of those tests is met.  (Emphasis added).

> . . . .

> I assume that Justice Kennedy's approach will be controlling in most cases *because it treats more of the nation's waters as within the Corps' jurisdiction*, but in the unlikely event that the plurality's test is met but Justice Kennedy's is not, courts should also uphold the Corps' jurisdiction.  In sum, in these and in future cases the United States may elect to prove jurisdiction under either test. (Emphasis added).[12]

*Id.* at 2265.

7.  It may be that Justice Kennedy didn't write a standard but only suggested that the Corps of Engineers do so.  As earlier stated, the plurality says he "tips a wink at the agency,

_____

[11]*See also, Parker v. Scrap Metal Processors, Inc.,* 386 F.3d 993, 1009 (11th Cir. 2004).  *Parker* was decided after the term "significant nexus" was first used  in SWANCC.

[12]Note the dissent's discussion that Justice Kennedy's test would be the most broad, not narrower, in the sense that it would confer the greatest jurisdiction to the Corps.  There is no other suggestion in *Rapanos* as to which opinion is broader or narrower.

inviting it to try its same expansive reading again." *Id.* at 2235.

8.  No justice in *Rapanos,* including Justice Kennedy, stated that Justice Kennedy's opinion would be the absolute holding of the case.

9.  There may be a question as to whether the "paucity of the record" contributed to the remand. *See Id.* at 2213.

*The Robison Decision*

Faced with an acknowledged fragmented and fractured Supreme Court opinion, the Eleventh Circuit struggled to determine what, if anything, *Rapanos* had held.  *Robison*  holds *inter alia*:

1.  That while the *Rapanos* plurality opinion does not control otherwise, it does serve to overrule *Eidson*.  "However, the defendants' trial occurred before *Rapanos*, and the Supreme Court *indicated* in *Rapanos*, that *Eidson's* 'expansive definition' of 'tributaries' is no longer good law."  *Robison*, 2007 WL 3087419 at *5 (citing the plurality opinion in *Rapanos*, 126 S. Ct. at 2217) (Emphasis added).  Apparently the plurality opinion governs on an as-needed  basis.[13]

2.  That although eight justices did not accept Justice Kennedy's "significant nexus" test, his opinion in that regard controls.  Apparently parties, lawyers and trial judges are charged with determining what one well-positioned Justice might decide.

3.  That since this court was not clairvoyant nor did it have the precognitive ability to know what a one man decision would be, it erred in not charging with regard to "significant nexus."

---

[13]The plurality opinion does not expressly state that it is overruling *Eidson*.  No other Justice agrees with such a purported position.

4.  Since the government did not argue that this court gave a "significant nexus" charge, it "tacitly" conceded that the instruction was erroneous "to some extent," even though the government apparently also argued that the *Eidson* test still, at least partially, controlled.

5.  That "Justice Kennedy disagreed with the plurality over the substance of the proper test." *Robison*, 2007 WL 3087419 at \*8.

6.  That, "as aptly noted by Chief Justice Roberts in his concurrence, neither Justice Scalia's plurality opinion, Justice Kennedy's concurrence, nor  Justice Steven's dissent 'command[ed] a majority of the court . . . ." *Id.* at \*9.  Further, that the respective opinions of Justices Scalia and Kennedy define different tests to be applied on remand.

7.  The law on the issue is to be based on Justice Kennedy's opinion because his concurrence provides "the least common denominator."  *See Id.* at \*10.  (Meaning what and how determined?)

8.  "The issue becomes whether the definition of 'navigable waters' in the plurality or concurring opinions (sic) in *Rapanos* was less far reaching, (i.e., less restrictive of CWA jurisdiction).  Notably, Justice Kennedy's test, *at least in wetlands cases* such as *Rapanos*, will classify a water as 'navigable' more frequently than Justice Scalia's."  *Id.* at \*11, 12 (Citations omitted).

Query: What is the significance of the "wetlands" qualifier in the second sentence?  More significantly, why, unlike in *Furman*, *Memoirs* and *Seibert* is the expansion of federal law narrower and less far reaching?

The thrust of the Eleventh Circuit opinion comes from its reading of *Marks v. U.S.*, 430 U.S. 188 (1997).  It notes the following language in *Marks*: "[w]hen a fragmented [Supreme]

Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding . . . may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Robison*, 2007 WL 3087419 at *11.

*Robison* further relied upon a Ninth Circuit case and a Seventh Circuit case. *See N. Cal. River Watch v. City of Healdsbury*, 496 F.3d 993 (9th Cir. 2007); *U. S. v. Gerke Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006).[14]  The Eleventh Circuit declined to follow *U.S. v. Johnson,* 467 F.3d 56 (1st Cir. 2006).  *Gerke* contains some interesting language as quoted by the Eleventh Circuit.  *Gerke* states that "[w]hen a majority of the Supreme Court agrees only on the outcome of a case and not on the ground for that outcome, lower-court judges are to follow the narrowest ground to which a majority of the Justices would have assented if *forced to choose*."  (By whom?)  *Gerke Excavating*, 464 F.3d at 724 (Emphasis added).  Further, that, "as a practical matter, Justice Kennedy's concurrence provides the least common denominator." (Meaning what?)  *Robison*, 2007 WL 3087419 at *10 (internal quotation marks omitted).  *Gerke* prophesied that the instances would be "rare" when Justice Kennedy would vote against finding CWA jurisdiction due to a lack of "significant nexus," even when the plurality and dissenting judges would vote for CWA jurisdiction based on other premises.  *See Id.* (citing *Gerke*, 464 F.3d at 725).[15]

*The Marks Case*

---

[14]It is rather impressive when the reputedly liberal Ninth Circuit agrees with the reputedly conservative Seventh Circuit.  *Northern California* partially relied upon by the Eleventh Circuit in *Robison* states, "The Supreme Court, however, has now narrowed the scope of [*U.S. v. Riverside Bayview Homes, Inc.*].  *See Rapanos v. U.S.* . . . ." *N. Cal. River Watch*, 496 F.3d at 995.  It is interesting that a one Justice decision can narrow the scope of a previous unanimous decision.

[15]Both the Seventh and Ninth Circuit cases are wetlands cases.

Ultimately, the Eleventh Circuit relied upon *Marks*, so it is appropriate to look at what precedent *Marks* relied upon in making a very general statement. The *Marks* Court relied solely on the following language in *Gregg v. Georgia*, 428 U. S. 153, 169 n. 15 (1976): "Since five Justices wrote separately in support of the judgments in *Furman*, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." *See Marks*, 430 U.S. at 193. It should be noted that *Gregg*, a death penalty case, considered *Furman v. Ga.*, 408 U.S. 238 (1972), also a death penalty case. *Gregg* also stated: "[b]ut until *Furman v. Ga.*, 408 U.S. 238 (1972), the Court never confronted squarely the fundamental claim that the punishment of death always, regardless of the enormity of the offense or the procedure followed in imposing the sentence, is cruel and unusual punishment in violation of the Constitution. Although this issue was presented and addressed in *Furman*, *it was not resolved*. Four Justices would have held that capital punishment is not unconstitutional *per se*; two justices would have reached the opposite conclusion; and three Justices, while agreeing that statutes then before the Court were invalid as applied, left open the question whether such punishment may ever be imposed." *Gregg*, 428 U.S. at 168-69. (Emphasis added). *Furman was decided on the merits*, but clearly on a narrower ground than the argument that all death penalties are unconstitutional. There was a substantive, final decision *on the merits*. The *Furman* court reversed the judgment of the state court and the case was effectively over. *Gregg*, for the first time, resolved the issue. It held that, "the punishment of death does not invariably violate the Constitution."*Id*. at 169.[16]

---

[16]It is of interest that Justice Stevens joined with the majority over the dissents of Justices Brennan and Marshall. The case was decided shortly after his appointment.

Similarly, the very case which was directly pertinent in *Marks* was decided on *its merits in a final decision* reversing the lower court.  In *Memoirs v. Mass.*, 383 U.S. 413 (1966), the Court considered whether certain materials were obscene.  The Court held that the materials at issue were not obscene, but did not hold that even obscene materials are protected by the First Amendment.  *Id.* at 420-21.

The "narrow" holding in *Memoirs* was clearly that the materials in that specific case were not obscene.  The obvious broader ruling would have been that even obscene materials are protected by the First Amendment.  The narrow holding in *Furman* was clearly that the death penalty was unconstitutional under the facts of that particular case.  The obvious broader ruling would have been that all death penalties are unconstitutional.  In neither *Furman* nor *Memoirs* was there any further decision to be made by a lower court.

The Supreme Court in *Rapanos* stated that, "[w]e granted certiorari and consolidated the cases to decide whether these *wetlands* constitute waters of the United States under the Act[.] *Rapanos*, 126 S. Ct. at 2220 (Emphasis added).  Obviously, the court did not so decide.  It remanded for further consideration.  In both *Furman* and *Memoirs*, the court *decided* substantive issues.  *Furman* and *Memoirs* are clearly distinguishable from *Rapanos*, in which there was no ruling on the merits and no final ruling except an order of remand.

Even assuming that *Marks* applies here, the only basis for finding a controlling holding in *Rapanos* is the Eleventh Circuit's *ipse dixit* determination that Justice Kennedy's opinion was narrower than that of the plurality.  Why was it narrower?  One purported basis is that "Justice Kennedy's concurrence rejected two 'limitations' imposed by the plurality's test on the definition of 'navigable waters.'"  *Robison*, 2007 WL 3087419 at *12.  Eight justices imposed a total

limitation on Justice Kennedy's test.  One would think that if *Marks* determines that Justice

Kennedy's test is the controlling one, the Supreme Court would have been helpful enough to so

acknowledge in at least a joint footnote in *Rapanos* itself.  Just think how many later

contradictory analyses that would save.[17]

Some of the statements in *Robison* would appear to belie its holding.  These include:

1.  "Because *Rapanos* was a *wetlands* case, Justice Kennedy's concurrence then focused

on when a *wetland* meets the 'significant nexus' test."  *Id.* at *8 (Emphasis added).

2.  Notably, Justice Kennedy's test, at least in *wetlands* cases such as *Rapanos* will

classify water as 'navigable' more frequently than Justice Scalia's test."  *Id.* at *12 (Emphasis

added).

3.  "The First Circuit's *Johnson* decision is nevertheless correct on this point: *Marks* does

not 'translate easily' to *Rapanos*."  *Id.* at *14.

4.  "As discussed later, in factual circumstances different from *Rapanos*, Justice Scalia's

test may be less restrictive of CWA jurisdiction; however, in determining the governing holding

in *Rapanos*, we cannot disconnect the facts in the case from the various opinions and determine

which opinion is narrower in the abstract." *Id*. at *12.[18]

5.  "This case *arguably* is one in which Justice Scalia's test may actually be more likely to

result in CWA jurisdiction than Justice Kennedy's test, despite the fact that Justice Kennedy's

test, as applied in *Rapanos* would treat more waters as within the scope of the CWA."  *Id.* at *13.

---

[17]Better yet, the Court could perhaps recognize that rather than just argue with each other, they should reach
clearly established law by at least a majority.

[18]I do not understand this last phrase.  Compare Justice Stevens' statement where he says that he assumes
that Justice Kennedy's approach will be controlling in most cases.

*Rapanos Is a Wetlands Case.  Robison Is Not.*

All the facts in *Rapanos* relate to wetlands.[19]   *Robison*  is not a wetlands case.  There would seem to be a significant question as to whether *Rapanos* is applicable to the facts of this case.[20]

*Rapanos* considers regulations of the Army Corp of Engineers which was the agency to grant or deny permits.  In *Robison*, that was the role of EPA and Alabama's ADEM.   Specific reference is made in *Rapanos* to "wetlands permits."  *Rapanos*, 126 S. Ct. at 2224.  The Army Corps of Engineers is involved with "permits for dredged or fill material" under Title 33 U.S.C. § 1344 as considered in *Rapanos*.  *Robison* involves EPA or ADEM permits issued under Title 33 U.S.C. § 1342.

. . . .

The *Rapanos* plurality states, " It is the discharge of 'dredged or fill material'-- which, unlike traditional water pollutants, are solids that do not readily wash down-stream–that we consider today."  *Id*. at 2216.  The *Robison* case involves "traditional water pollutants" that wash downstream.

. . . .

"We granted certiorari and consolidated the cases, 546 U.S. ___, 126 S.Ct. 414, 163 L.Ed.2d 316 (2005), to decide whether these wetlands constitute 'waters of the United States'

---

[19]Note the continual quoted references hereinafter to wetlands.

[20]Justice Scalia's opinion is partially premised on the excesses with regard to wetlands, both in area size and costs.

under the Act, and if so, whether the Act is constitutional." *Id.* at 2220.

. . . .

"These consolidated cases require the Court to decide whether the term 'navigable waters' in the Clean Water Act extends to wetlands that do not contain and are not adjacent to waters that are navigable in fact." *Id*. at 2235.

. . . .

"The statutory term to be interpreted and applied in the two instant cases is the term 'navigable waters.' The outcome turns on whether that phrase reasonably describes certain Michigan wetlands the Corps seeks to regulate." *Id*. at 2237.

. . . .

"*Riverside Bayview* and *SWANCC* establish the framework for the inquiry in the cases now before the Court: Do the Corps' regulations, as applied to the wetlands in *Carabell* and the three wetlands parcels in *Rapanos,* constitute a reasonable interpretation of 'navigable waters' as in *Riverside Bayview* or an invalid construction as in *SWANCC?"* *Id*. at 2241.

. . . .

"Consistent with *SWANCC* and *Riverside Bayview* and with the need to give the term 'navigable' some meaning, the Corps' jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense." *Id*. at 2248.

. . . .

"When the Corps seeks to regulate wetlands adjacent to navigable-in-fact waters, it may rely on adjacency to establish its jurisdiction. Absent more specific regulations, however, the

Corps must establish a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries. Given the potential overbreadth of the Corps' regulations, this showing is necessary to avoid unreasonable applications of the statute. Where an adequate nexus is established for a particular wetland, it may be permissible, as a matter of administrative convenience or necessity, to presume covered status for other comparable wetlands in the region. That issue, however, is neither raised by these facts nor addressed by any agency regulation that accommodates the nexus requirement outlined here." *Id*. at 2249.

. . . .

"Yet in most cases regulation of wetlands that are adjacent to tributaries and possess a significant nexus with navigable waters will raise no serious constitutional or federalism difficulty."  *Id*. at 2249.

. . . .

 "The narrow question presented in No. 04-1034 is whether wetlands adjacent to tributaries of traditionally navigable waters are "waters of the United States" subject to the jurisdiction of the Army Corps; the question in No. 04-1384 is whether a manmade berm separating a wetland from the adjacent tributary makes a difference."  *Id*. at 2252.

. . . .

"The Corps' resulting decision to treat these wetlands as encompassed within the term "waters of the United States" is a quintessential example of the Executive's reasonable interpretation of a statutory provision."  *Id*. at 2252.

. . . .

18

"Because *Rapanos* was a *wetlands* case, Justice Kennedy's concurrence then focused on when a *wetland* meets the 'significant nexus' test." *Robison*, 2007 WL 3087419 at *8.

. . . .

"Given that wetlands serve these important water quality roles and given the ambiguity inherent in the phrase 'waters of the United States,' the Corps has reasonably interpreted its jurisdiction to cover non-isolated wetlands." *Rapanos*, 126 S. Ct. at 2257.

The *Rapanos* opinions otherwise repeatedly refer to wetlands issues.  It is at least questionable as to whether *Rapanos* has any reach beyond wetlands cases.  *Gerke* states: "Thus, establishing that *wetlands* such as those at the *Rapanos* and *Carabell* sites are covered by the Act . . . requires . . . ."  *Gerke Excavating,* 464 F.3d at 724.  Further, that "the test [Justice Kennedy] proposed is that '*wetlands* possess the requisite nexus . . . if the *wetland* . . . significantly affects . . . ."  *Id.*  Further, "[w]hen in contrast, *wetlands*' effects on water quality are speculative or insubstantial . . . ."  *Id.*  Further, "[t]hus, any conclusion that Justice Kennedy reaches in favor of federal authority over *wetlands* in a future case . . . ."  *Id.* at 725.[21]

*Robison Is a § 1342 Case*

*Rapanos* is substantially based upon Title 33 U.S.C. § 1344.  Title 33 U.S.C. § 1342 is mentioned only in passing in *Rapanos*.  Under § 1344, permits are regulated by the Army of Engineers.  Under § 1342, permits are regulated by the Environmental Protection Agency.  *Robison*, while a case brought pursuant to § 1342, does not mention § 1342 nor § 1344.   The distinction between § 1344 and § 1342 is discussed in the plurality opinion at page 2227.

---

[21]*Gerke* continually speculates on what *might* happen in other cases.

I note that "permits for dredged or fill material" are governed by Title 33 U.S.C. § 1344 which provides for permits issued by the Secretary of the Army, acting through the Chief of Engineers.  Under § 1342, the Administrator of the Environmental Protection Agency prescribes conditions regarding "permits for discharge of pollutants."

<em>The Term "Significant Nexus"</em>

At the time of trial, the term "significant nexus" as defined by Justice Kennedy was only a gleam in Justice Kennedy's eye.  The term "significant nexus" was apparently first used by Chief Justice Rehnquist in *Solid Waste Agency of N. Cook County. v. Army Corps of Eng'rs*, 531 U.S. 159, 167 (2001) (SWANCC).   The term was in an almost a throw-away reference to *U.S. v. Riverside Bayview Homes, Inc.*, 474 U. S. 121 (1985), which does not use the term.  The term is not defined in SWANCC..   In SWANCC it may have been solely a proximity term.

It may be that Justice Kennedy did not really establish a specific standard.  He stated, "A more specific inquiry, based on the significant nexus standard, is therefore necessary.  Thus, a remand is again required to permit application of the appropriate legal standard." *Rapanos,* 126 S. Ct. at 2252.

<em>More About Marks</em>

Under the approach in *Robison*, a single Justice who joins in a judgment with a plurality and gives a purported narrower reason may always govern the holding.  A single concurring Justice can maneuver to establish the law by disagreeing with the rationale of the plurality. Apparently no Justice in *Rapanos*  recognized the application of *Marks*.  No Justice in *Rapanos*, including Justice Kennedy, stated that his opinion would be the sole holding of the case.

*Gerke Excavating,* 464 F.3d at 724, offers the following indefinite advice: "When a majority of the Supreme Court agrees only on the outcome of a case and not on the ground for that outcome, lower court judges are to follow the narrowest ground to which a majority of the Justices would have assented if *forced to choose*." (Emphasis added). By whom? The *Rapanos* dissenters indicated that Justice Kennedy's opinion was the broader one. The plurality did not comment on the issue.

Perhaps the following statement in *Marks* is more appropriately applicable. "But the principle on which the [Ex Post Facto] Clause is based --the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties-- is fundamental to our concept of constitutional liberty." *Marks,* 430 U.S. at 191. Who could have predicted the ultimate one Justice controlling opinion? In the event of a re-sentencing, this should at least be considered as a Title 18 Section 3553(a) factor.

"The *Gerke* court explained that it found Justice Kennedy's test to be 'narrower (so far as reining in federal authority is concerned . . . in most cases, though not in all." *Robison,* 2007 WL 3087419 at *9. *Robison* equates, citing *Gerke*, the terms "narrowest grounds" and "less far reaching" with being "less-restrictive of CWA jurisdiction." *Id.* at *11. This is exactly contrary to *Furman*, *Memoirs*, *Gregg* and *Marks* itself. In these cases, the most restrictive application of the Constitution and federal law is the narrowest. To suggest to the contrary is to say that interpretations of the CWA which give it its broadest reach are the narrowest interpretations of the CWA. The dissent assumes that "Justice Kennedy's approach will be controlling in most cases because it treats more of the nation's waters as within the Corps jurisdiction . . . ." *Rapanos,* 126 S. Ct. at 2265 n. 14.

*Robison* also cites *U. S. v. Gonzalez-Lauran*, 437 F.3d 1128, 1134-1139 (11th Cir. 2006), which discusses *Missouri v. Seibert*, 542 U. S. 600 (2004).  In *Gonzalez-Lauren* the Eleventh Circuit concluded that Justice Kennedy's prevailing concurrence was "narrower" than the plurality opinion.  *Gonzalez-Lauran*, 437 F.3d at 1135.  In *Seibert*, the plurality's five factors for determining when *Miranda* had been violated, as stated by Justice Kennedy, "[cut] too broadly." *Id.* at 1135.  There is some suggestion that the court in *Gonzalez-Lauzan* applied both the plurality broader test and the Kennedy "narrower" test.  *Id.* at 1138.  On the other hand, it may have applied the one Justice Kennedy opinion.  *Id.* at 1139.  In any event, contrary to the ruling in *Robison*, the Kennedy test was "narrower" because it would allow *less expansion* of *Miranda*. Justice Kennedy's test was a subset of a test which would allow a broader application of *Miranda*.  *Robison*, which held that Justice Kennedy's one Justice opinion was narrower and controlling because it did more to expand the reach of the federal Clean Water Act, appears to be inconsistent with the *Gonzalez-Lauren* holding that another of Justice Kennedy's one Justice opinions was narrower and controlling because it did less to expand the reach of the federally mandated *Miranda* rule.

### *Does Rapanos Establish New Law?*

In *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1248 (11th Cir. 2001), the court makes most apt statements as follows:

> While it may be possible to speculate that all four of the Justices who joined Justice Brennan's opinion might have embraced treating student body diversity as a compelling interest even in the absence of a valid remedial purpose, that kind of speculation is inconsistent with *Marks.*  Moreover, we think this speculation unsound. It requires us to ignore the language and rationale of Justice Brennan's opinion and to draw assumptions that have no

basis in the opinion, a particularly unwise course given that Justice
Brennan's opinion disagreed with Justice Powell's not only
regarding the fundamental issue of whether the university's set-
aside was valid, but also on the proper constitutional test for
analyzing the use of race.

. . . .

Further,

The Supreme Court has not compelled us to find a "holding" on
each issue in each of its decisions. On the contrary, the Court has
indicated that there may be situations where even the *Marks*
inquiry does not yield any rule to be treated as binding in future
cases.  In *Nichols  v. United States*, 511 U. S. 738, 114 S.Ct. 1921,
128 L.Ed.2d 745 (1994)**,** the Court considered whether an
uncounseled misdemeanor conviction, valid due to the absence of
the imposition of a prison term, is also valid when used to enhance
the punishment for a subsequent conviction. That issue was
addressed in an earlier decision, *Baldasar v. Illinois*, 446 U.S. 222,
100 S.Ct. 1585, 64 L.Ed.2d 169 (1980),where the Court fractured
much as it did in *Bakke.* The Supreme Court's initial task in
*Nichols* was to determine, by undertaking the *Marks* inquiry,
whether *Baldasar* had indeed decided the issue. After examining
*Baldasar,* the Court concluded-as had several lower courts-that the
*Marks* inquiry was simply not helpful:

In *Marks* [ ], we stated that when a fragmented Court decides a
case and no single rationale explaining the result enjoys the assent
of five Justices, the holding of the Court may be viewed as that
position taken by those Members who concurred in the judgments
on the narrowest grounds. This test is more easily stated than
applied to the various opinions supporting the result in *Baldasar*. A
number of Courts of Appeals have decided that there is no lowest
common denominator or narrowest grounds that represents the
Court's holding. Another Court of Appeals has concluded that the
holding in *Baldasar* is Justice Blackmun's rationale; yet another
has concluded that the consensus of the *Baldasar* concurrences is
roughly that expressed by Justice Marshall's concurring opinion.
State courts have similarly divided. The Sentencing Guidelines
have also reflected uncertainty over *Baldasar. We think it not
useful to pursue the Marks inquiry to the utmost logical possibility
when it has so obviously baffled and divided the lower courts that*

*have considered it.* This degree of confusion following a splintered
decision such as *Baldasar* is itself a reason for reexamining that
decision.  511 U.S. at 745-46, 114 S.Ct. At 1926-27 (emphasis
added) (citations, internal quotation marks, and brackets omitted).

This Court obviously does not have the option of re-examining
*Bakke* as we might our own precedent. Nevertheless, the Supreme
Court has recognized that there will be situations where no binding
"rule" may be taken from a fractured decision, and the *Marks*
inquiry is ultimately "not useful." *Id.  Bakke* surely presents such a situation.
*Id*. at 1248 n.12.

. . . .

Further,

In the end, the fact is inescapable that no five Justices in *Bakke*
expressly held that student body diversity is a compelling interest
under the Equal Protection Clause even in the absence of valid
remedial purpose. As our predecessor court aptly put it, "[i]n over
150 pages of the U.S. Reports, the Justices [in *Bakke* ] have told us
mainly that they have agreed to disagree." *Id.* at 1248.

See other discussion in *Johnson v. Bd of Regents* for why it may be inappropriate to apply *Marks*

here.

The following statements in *United States v. Johnson*, *supra*, makes perfect sense.

Even if we take this more sensible approach to *Marks,* however,
the case still poses problems in the situation before us. As the D.C.
Circuit held in an en banc opinion, " *Marks* is workable-one
opinion can be meaningfully regarded as 'narrower' than another-
only when one opinion is a logical subset of other, broader
opinions." *64. *King v. Palmer,* 950 F.2d 771, 781 (D.C. Cir.
1991) (en banc). In other words, the "narrowest grounds" approach
makes the most sense when two opinions reach the same result in a
given case, but one opinion reaches that result for less sweeping
reasons than the other. When applied to future cases, the less
sweeping opinion would require the same outcome in a subset of
the cases that the more sweeping opinion would. For example, in
*Furman,* the Justices who concluded that capital punishment was
per se unconstitutional would always strike down future death
penalty sentences, but the Justices who found only that the death

24

penalty was unconstitutional as administered in *Furman* would only strike down capital sentences in a subset of future capital cases. Similarly, in *Memoirs,* the absolutist view of the First Amendment held by two Justices would always require a ruling in favor of protecting speech, but the view of three other Justices that only non-obscene speech is protected would extend First Amendment protection only to a subset of such cases. Thus, the less sweeping opinion in each case represents the "narrowest grounds" for the decision.

This understanding of "narrowest grounds" as used in *Marks* does not translate easily to the present situation. The cases in which Justice Kennedy would limit federal jurisdiction are not a subset of the cases in which the plurality would limit jurisdiction. As *Gerke* points out, in cases where there is a small surface water connection to a stream or brook, the plurality's jurisdictional test would be satisfied, but Justice Kennedy's balancing of interests might militate against finding a significant nexus. In such a case, if Justice Kennedy's test is the single controlling test (as advocated by the Seventh and Ninth Circuits), there would be a bizarre outcome-the court would find no federal jurisdiction even though eight Justices (the four members of the plurality and the four dissenters) would all agree that federal authority should extend to such a situation. This possibility demonstrates the shortcomings of the *Marks* formulation in applying *Rapanos.*  467 F.3d at 63-64.

I  recommend a full reading of *U.S. v. Johnson* and also the scholarly report and recommendation of the magistrate judge in *U.S. v. Evans*, 2006 WL 2221629 (M.D. Fla. Aug. 2, 2006).

*Eidson Overruled?*

*Robison,* 2007 WL 3087419 at *5, citing the plurality opinion in *Rapanos*, 126 S. Ct. at 2217, states that *Rapanos* holds that *Eidson* is no longer good law.  I do not see where the plurality so stated.  The plurality opinion does state, "It is the discharge of 'dredged or fill material'– which unlike traditional water pollutants, are solids that do not readily wash

downstream– that we consider today." *Rapanos*, 126 S. Ct. at 2216.[22]

Both Justice Kennedy's opinion and the dissent's opinion disagree with any suggestion in the plurality opinion that *Eidson* has been overruled based on the plurality's discussion about intermittent streams, etc.  There would appear to be a five judge majority at least on this issue.  If anything is clear, it should be clear that the *Rapanos* plurality did not garner enough votes to overrule *Eidson*. While the Eleventh Circuit relied on Justice Kennedy's opinion for the applicable test, it relied upon the plurality in determining that *Eidson* had been overruled.  This determination drew only four votes.  *Robison* states, "Specifically Justice Kennedy's concurrence rejected the plurality's requirement that 'navigable waters' must be relatively permanent, standing or flowing bodies of waters . . . ."  *Robison,* 2007 WL 3087419 at *12.

Even Justice Scalia's opinion suggests that *Eidson* has not been overruled.  He stated,

> Respondents and their *amici* urge that such restrictions on the scope of "navigable waters" will frustrate enforcement against traditional water polluters under 33 U.S.C. §§ 1311 and 1342. Because the same definition of "navigable waters" applies to the entire statute, respondents contend that water polluters will be able to evade the permitting requirement of § 1342(a) simply by discharging their pollutants into noncovered intermittent watercourses that lie upstream of covered waters. See Tr. of Oral Arg. 74-75.
>
> That is not so. Though we do not decide this issue, there is no reason to suppose that our construction today significantly affects the enforcement of § 1342, inasmuch as lower courts applying § 1342 have not characterized intermittent channels as "waters of the United States." The Act does not forbid the "addition of any pollutant *directly* to navigable waters from any point source," but rather the "addition of any pollutant *to* navigable waters." § 1362(12)(A) (emphasis added); § 1311(a). Thus, from the time of

---

[22]Like in *Robison.*

the CWA's enactment, lower courts have held that the discharge
into intermittent channels of any pollutant *that naturally washes
downstream* likely violates § 1311(a), even if the pollutants
discharged from a point source do not emit "directly into" covered
waters, but pass "through conveyances" in between.

_____The following also appear to dispute that there has been any such holding:

"[W]e have no occasion in this litigation to decide exactly when the drying-up of a stream

bed is continuous and frequent enough to disqualify the channel as a water of the United States."

*Rapanos*, 126 S. Ct. at 2221 (internal quotation marks omitted).

. . . .

"It is of course true, . . . that ditches, channels, conduits and the like 'can hold water

permanently as well as intermittently . . . .  But when they do, we usually refer to them as 'rivers,'

'creeks,' or streams."  *Id*. at 2223 n. 7.  Creeks are involved in *Robison.*

<u>Sufficiency of Evidence</u>

I strongly suggest that, if the convictions are due to be reversed, the charges should be

dismissed under the Double Jeopardy Clause.  It would appear that the Eleventh Circuit opinion

is saying that if controlling law at the time of trial is later overruled, there cannot be a granting of

judgment of acquittal based on an insufficiency of evidence at the trial as examined under the

new rule.  How far does that law extend and to what types of cases?  Would it apply if the new

law were to be announced after trial, but before a post verdict renewal of a motion for judgment

of acquittal is ruled upon?[23]

_____

[23]I note that Title 18 U.S.C. § 3731 states, "An appeal by the United States shall lie to a court of appeals
from a decision or order of a district court suppressing or excluding evidence . . . , *not made after the defendant has
been put in jeopardy and before the verdict . . . .*"  (Emphasis added).

I cannot think of anything more jeopardizing than for a defendant to face further trial(s) when, through no fault of his, the law questionably changes and it is determined that the evidence against him at the first trial was insufficient.  After a further trial, will another change in the law start a repeat cycle of more trials?

*Robison* relies upon *U.S. v. Sanchez-Corcino* 85 F.3d 549, 554 n.4 (11th Cir. 1996).  That case in turn cites *U.S. V. Wacker*, 72 F.3d 1453, 1464-65 (10th Cir. 1995).  *Wacker* and *Robison* both rely on *Lockhart v. Nelson*, 488 U.S. 33 (1988).  *Lockhart* held that if the evidence admitted, including that erroneously admitted , would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not forbid a retrial.  That is not the case here.  *Lockhart* states, "It appears to us to be beyond dispute that this is a situation described in *Burks* as reversal for 'trial error'-the trial court erred in admitting a particular piece of evidence, and without it there was insufficient evidence to support a judgment of conviction.  But clearly *with* that evidence, there was enough to support the sentence."  *Id*. at 40.  *Robison* does not say that was evidence erroneously admitted or that this court did not allow evidence to be admitted.

This court never made a trial ruling which would have precluded the government offering or having admitted evidence which would support a so-called "significant nexus" finding.  This court would have unquestionably allowed such evidence even under *Eidson*.  The evidence was either not available or, if available, was not produced by the government.  *See Burks v. U. S.*, 437 U.S. 1 (1978).  I have not been previously aware that a court's denying a defense motion and stating its reasoning takes away the government's incentive to offer sufficient evidence.  If

anything removed the government's incentive to present evidence to support "significant nexus," it was *Eidson* itself.

*Summary*

In summary, I think that the issues include:

1. Is Justice Kennedy's ruling in *Rapanos* truly the narrower one and controlling?

2. In any event, is *Rapanos* adaptable to the *Marks* rule?

3. Is *Rapanos*, a § 1344 dredge and fill wetlands case, applicable to *Robison*, a § 1342 pollutant discharge case?[24]

4. If the evidence was insufficient, should the Double Jeopardy Clause bar another trial? Does the Double Jeopardy Clause go out the window when there is a change of law?

5. Was *Eidson* overruled by a four Justice plurality whose opinion was not otherwise deemed to be controlling, when five Justices disagreed with the premise upon which such overruling was purportedly based; particularly when it is not clear that the plurality itself purported to overrule *Eidson*?

6. Is Rapanos like *Bakke*, where new law was not established?

7. Will a further trial have to await a new regulation as suggested by Justice Kennedy?

Final Observations

---

[24]It may be that the Supreme Court has not decided a pure § 1342 case.  Most, if not all, of the cited Supreme Court and lower court cases are either wetland cases or, as in SWANCC, an intrastate Migratory Bird Rule case.

When I was president of the Anniston, Alabama Jaycees, I would, at its meetings, lead the members in repeating the Jaycee Creed displayed on a standing cloth banner.  It included that we "are a government of laws and not of men."  Perhaps, it should be amended to add that "Sometimes we are a government of one (man) (woman) and not of law."  It is not the reversal of the convictions in and of itself which concerns me.  It is the methodology by which the result has been reached.  I realize that I may be subject to criticism for telling the truth.  While this opinion may seem somewhat surly,  it may be understandable when this court spent over two months preparing for and trying this case only to be told that it must be done again because of a questionable change in the law.  At age 76, this is not my swan song, but it may be preparatory to one.  Throughout their lives, swans emit hissing and shrill sounds.  It may be a myth that they ultimately emit a melodious sound.  My emissions are likely no worse than those of the Justices.  See above.

I have often considered creating a neologism and submitting it for approval and acceptance.  *See Through The Looking Glass* where Humpty Dumpty discusses portmanteau words.  ("Mimsy" is a combination of "Flimsy" and "miserable.')  My neologism would be "justsurdity."  I may suggest the word to describe those areas of the law which help to attain justice, but appear to be absurd when considered in the light of common sense.  I could name a large number of examples.

This the 7th day of November, 2007.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**